1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

THE MOUNTAINEERS, *et al.*,          )
                                     )
                 Plaintiffs,         )
                                     )          CASE NO.  C05-1418RSM
        v.                           )
                                     )
UNITED STATES FOREST SERVICE, *et al.*,  )      ORDER GRANTING MOTION
                                     )          FOR SUMMARY JUDGMENT
                                     )          AND FOR PERMANENT
                 Defendants.         )          INJUNCTION AND DENYING
                                     )          CROSS-MOTION FOR
                                     )          SUMMARY JUDGMENT
_____)

## I.  INTRODUCTION

This matter comes before the Court on plaintiffs' Motion for Summary Judgment and

Entry of Permanent Injunction and defendants' Cross-Motion for Summary Judgment (Dkts.

#13 and #17).  Plaintiffs argue that the Mad River Trail Project violates a 1999 ruling by the

Honorable Barbara Jacobs Rothstein, United States District Judge, in a separate case in this

Court, and that irrespective of the effect of Judge Rothstein's order, the decision by the Forest

Service to proceed with the Mad River Trail Project was arbitrary and capricious, and does not

pass the standard of judicial review under the Administrative Procedure Act, 5 U.S.C. §§ 701-

706 (2000) ("APA").  Plaintiffs further argue that the Forest Service violated the National

Environmental Policy Act, 42 U.S.C. §§ 4321-4370f (2000) ("NEPA") and its implementing

regulations, 40 C.F.R. §§ 1500-1508 (2005), in its preparation of the Mad River Trail Project

Environmental Assessment ("EA") and related analyses.  Finally, plaintiffs request that the

ORDER
PAGE – 1

1   Court enter a permanent injunction prohibiting the Forest Service from attempting or

2   completing any work on the Mad River Trail Project, or otherwise taking action to implement

3   that project, until the agency has complied with NEPA by completing a full Environmental

4   Impact Study ("EIS").

5          Defendants argue that the Forest Service's decision to proceed with the Mad River Trail

6   Project violates "neither the letter nor the spirit" of Judge Rothstein's 1999 order.  Defendants

7   next argue that the EA meets the reasonable range of alternatives requirements that NEPA

8   imposes.  Finally, the government argues that the Forest Service did not violate Judge

9   Rothstein's order by failing to undertake a study of the site-specific impacts of the trail system

10  on wildlife because it, in fact, conducted such a study.

11         For the reasons set forth below, the Court disagrees with defendants and GRANTS

12  plaintiffs' motion for summary judgment and for preliminary injunction.

13                                **II.  DISCUSSION**

14      **A.  Background**

15         This case involves a challenge to the United States Forest Service's Mad River Trail

16  Project – a plan to construct a bridge, improve a campground, build a "helispot" for helicopter

17  landings, and relocate sections of trail in the Entiat Ranger District of the Wenatchee National

18  Forest.  This controversial project would allow off-road vehicles ("ORVs") – specifically,

19  motorcycles – to access an area of the Lower Mad River Trail from Maverick Saddle in the first

20  week of June, rather than in the third or fourth week.  It would also result in the continued

21  increase of motorized traffic throughout the numerous ORV trail systems connected in one way

22  or another to the Mad River system.

23         At present, ORVs cannot cross the Mad River at the Maverick Saddle ford in early June

24  due to high water.  As a result, the area is only easily accessible from Maverick Saddle during

25  that period to hikers who climb across logs or backpack up from lower elevations.  The

26  proposed Maverick Saddle Bridge would change this, and allow ORVs to cross the Mad River

ORDER
PAGE – 2

1  onto the Lower Mad River Trail as soon as the snow melts, if not before.

2      Perhaps more significantly, by making Maverick Saddle the hub of a network of

3  interconnected trails, the project will cause an overall increase in ORV traffic not only in the

4  project area, but throughout the Wenatchee National Forest.  Indeed, the Mad River project is

5  only one of numerous related projects that are either proposed, under way, or have recently

6  been completed that the Forest Service itself recognizes will have the ultimate effect, whether

7  intended or not, of increasing the use of ORVs in the Forest.  *See* Administrative Record

8  ("AR") at 2993-94.

9      The network of ORV trails in the Wenatchee National Forest is extensive and heavily

10  used.  There are over 200 miles of motorized-use trails in the system, spanning around 600

11  square miles of terrain – essentially the entire area between Lake Wenatchee and Lake Chelan.

12  (*See* Dkt. #14 at 13 and Dkt. #21 at 17).  Although use levels and types vary by trail, motorized

13  use dominates, and is fairly heavy; for example, in the Upper and Lower Mad River areas there

14  are some 4000 visitors per season, some 60% of whom are riding motorcycles.  (*See* AR at

15  2991 and 2969).

16      The Mad River Trail Project is the latest in a long line of small projects that have together

17  created the Wenatchee National Forest's ORV trail system.  The Mad River project is physically

18  connected to another project currently in the EA phase, the Goose-Maverick ORV Tie Trail

19  project.  The Goose-Maverick project proposes to create an ORV bypass trail connecting the

20  Mad River trail system to the nearby Goose Creek trail system.  Goose-Maverick is merely the

21  most recent incarnation of a project that was derailed by previous NEPA litigation, with one

22  significant difference: parts of it have now been shifted into the Mad River Project.

23      In 1997, the Forest Service distributed an EA for the first incarnation of the Goose-

24  Maverick ORV Tie Trail project.  (AR at 1900-2016).  The project contained substantially the

25  same trail design as that envisioned by the current Goose-Maverick ORV Tie Trail EA, except

26  that it also included the Maverick Saddle Bridge.  (*See* AR at 3320-87).

1    On the basis of the 1997 EA for the Goose-Maverick project, the Forest Service entered a

2    Decision Notice and Finding of No Significant Impact ("FONSI") and notice of decision to

3    proceed with the tie-trail project, including the Maverick Saddle Bridge.  (AR at 2041-56).

4    Soon after the entry of the 1997 EA, and following a failed administrative appeal, the plaintiffs

5    in the case now before the Court – accompanied by a number of other environmental groups –

6    filed suit under the APA to enjoin the completion of the Goose-Maverick project as: (1) an

7    abuse of agency discretion; (2) arbitrary and capricious; and (3) a violation of NEPA.

8    According to the plaintiffs, the agency had performed an inadequate study of the impacts

9    of the project on non-motorized users and area wildlife.  Plaintiffs also argued that the Goose-

10   Maverick EA was impermissibly segmented for NEPA purposes, in that it looked only at the

11   effects of the project on a narrowly defined study area and did not account for potential

12   resource damage in the overall trail system.  Finally, plaintiffs claimed that the EA was

13   insufficient because it failed to examine the past, present, and future reasonably foreseeable

14   cumulative impacts that increased ORV use would have on the project area and related trail

15   systems.

16   Plaintiffs' arguments were apparently persuasive.  On August 31, 1999, Judge Rothstein

17   granted their motion for a preliminary injunction barring the Forest Service from proceeding

18   with the Goose-Maverick ORV Tie Trail project without further study.  *See North Cascades*

19   *Conservation Council v. United States Forest Service*, 98 F. Supp. 2d 1193 (1999).

20   Specifically, Judge Rothstein ruled that plaintiffs had demonstrated a likelihood of irreparable

21   injury combined with a probability of success on the merits with respect to the question of

22   whether the Forest Service's reliance on the February 1997 EA violated NEPA.  According to

23   the Court, "the Forest Service acted arbitrarily or capriciously by (1) failing to address the

24   cumulative environmental impacts on the ORV trail system of this Project and two other

25   proposals tied to the ORV trail system, and (2) failing to consider the Project's effect of wildlife

26   outside of the narrowly defined 'project area.'"  *Id.* at 1196.

1    Following Judge Rothstein's ruling, the agency stipulated that it would withdraw approval

2    of the Goose-Maverick ORV Tie Trail project, and that there was "no longer an active dispute

3    between the parties concerning the subject matter of the lawsuit."  Accordingly, the case was

4    dismissed.  (Dkt. #18, Ex. A).

5    After the dismissal of *North Cascades Conservation Council*, the Forest Service returned

6    to work on the Goose-Maverick project.  However, it shifted the disputed Maverick Saddle

7    bridge proposal (among the most contentious aspects of the first lawsuit) from the Goose-

8    Maverick ORV Tie Trail project to the more innocuous Mad River Trail Project, which

9    contained elements that would actually reduce the environmental impacts of ORVs.  (*See* AR at

10   2935) (Mad River EA).

11   In 2003, the Forest Service also completed two new Biological Assessments addressing

12   the impact of the Mad River Trail project on endangered, threatened, and sensitive species.  The

13   first Biological Assessment examined the impact of the proposed project on terrestrial species.

14   (AR at 2619-37).  The second addressed key fish species in the Mad River watershed.  (AR at

15   2638-2715).  In addition, the agency commissioned and completed a "literature review," (the

16   "Gaines Report," so named after one of its authors), which sought to develop an analytic model

17   with which the effects of "linear recreation routes" (i.e., roads and trails) could be assessed with

18   respect to particular species.  (AR at 2831-2917).

19   The Forest Service then embarked on the public planning process for its desired actions.

20   It revived the Goose-Maverick ORV Tie Trail EA, minus the Maverick Saddle Bridge, and

21   began the simultaneous, but unconnected, scoping and drafting of the Mad River Trail Project.

22   (*See* AR at 2371-74) (May 1, 2001 request for comments on Mad River Trail Project).  The

23   stated purpose and need for the Mad River project was to: (1) reduce trail impacts to sensitive

24   fish species; (2) limit the spread of noxious weeds; (3) ensure that existing trails meet

25   management objectives; (4) reduce visitor hazards; and (5) accommodate increased use at the

26   Pine Flats Campground.  (AR at 2936).

1    On February 5, 2004, the agency announced that it had completed the EA for the Mad

2    River Trail Project, which examined four alternative actions aimed at meeting these goals.  (AR

3    at 3129).  Aside from the "no action" alternative, all the alternatives involved some combination

4    of rerouting ORV trails out of the Mad River flood plain, building a bridge over the River at

5    Maverick Saddle (or hardening the ford), updating the Pine Flats Campground, installing a

6    helispot, removing fire-damaged trees, and hardening trails with numerous concrete

7    "gridblocks" in the areas most prone to ORV damage.  (*See* AR at 2955-60).

8    Plaintiffs objected to the proposed alternatives as written, and submitted detailed

9    comments to that effect throughout the project's public comment periods.  Among other

10    reasons, the environmental groups felt as though the analysis should be conducted in

11    conjunction with that of the Goose-Maverick project, because the two were "inextricably

12    linked."  (*See, e.g.*, AR at 3157) (letter of Sierra Club).

13    Due in part to these comments, on March 5, 2004, the Forest Service extended the

14    comment period of the Mad River Trail Project to make it coterminous with that of the Goose-

15    Maverick ORV Tie Trail project.  (AR at 3148-49) (letter of Ranger Whitehall).  During this

16    period, the plaintiffs submitted extensive comments complaining about the sufficiency of the

17    separate EAs.  (AR at 3414-54).

18    Nonetheless, on November 17, 2004, the agency entered a FONSI based on the Mad

19    River Trail Project EA.  According to the Forest Service, ORV use in the area has not resulted

20    in significant impacts to the environment.  On the basis of the Biological Assessments, the

21    Forest Service also concluded that the project's combined components at worst "may affect, but

22    are not likely to adversely affect," any threatened, endangered, or sensitive species.  (AR at

23    3526-27) (FONSI).

24    Questioning the conclusions of the FONSI, plaintiffs filed an administrative appeal with

25    the agency seeking reconsideration of the project, but were denied.  (Dkt. #14, Ex. 10).  This

26    lawsuit followed.  Plaintiffs allege that the Forest Service has failed to analyze the effects of the

ORDER
PAGE – 6

1    Mad River Trail Project on the human environment adequately to satisfy NEPA, and is violating

2    Judge Rothstein's 1999 order.  Plaintiffs also allege that the agency's decision to proceed with

3    the project is arbitrary, capricious, and should be permanently enjoined unless an Environmental

4    Impact Statement ("EIS") is conducted that more completely addresses the environmental

5    impacts of increased motorized use on existing trails, engages in a detailed analysis of the

6    cumulative environmental effects of ORV use in the project area, and contains a full scientific

7    study of the effects of such use on wildlife.

8        **B. Summary Judgment Standard**

9        Summary judgment is appropriate when "there is no genuine issue as to any material fact

10   and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

11   "Only disputes over facts that might affect the outcome of the suit under the governing law will

12   preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

13   (1986).

14       A district court reviewing an agency decision under Section 706 of the APA "is to

15   determine whether or not as a matter of law the evidence in the administrative record permitted

16   the agency to make the decision it did." *Occidental Eng'g Co. v. Immigration and*

17   *Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir. 1985).  *See also Citizens to Preserve Overton*

18   *Park v. Volpe*, 401 U.S. 402, 415 (1971), *overruled on other ground by Califano v. Sanders*,

19   430 U.S. 99 (1977); *Lands Council v. Vaught*, 198 F. Supp. 2d 1211, 1221 (E.D. Wash. 2002).

20   Thus, when causes of action arise from a complete administrative record, summary judgment is

21   appropriate.  *See, e.g.*, *National Audubon Soc. v. Butler*, 160 F. Supp. 2d 1180, 1188 (W.D.

22   Wash. 2001); *Friends of Endangered Species v. Jantzen*, 589 F. Supp. 113, 118 (N.D. Cal.

23   1984).

24       This necessitates that the Court examine whether defendants' failure to prepare an EIS for

25   the Mad River Trail Project and related actions violates NEPA as a matter of law.  In making

26   this determination, the Court is generally restricted to review of the administrative record as it

1    existed at the time of the agency's decision.  However, a court may properly consider extra-

2    record materials "to determine what matters the agency should have considered but did not,"

3    *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980).  *See also Seattle Audubon Society v.*

4    *Moseley*, 798 F. Supp. 1473, 1477 (W.D. Wash. 1992).  Here, the Court has already ruled that

5    the some extra-record materials are admissible for the purposes of its decision.  (*See* Dkt. #25).

6         **C.  Effect of Judge Rothstein's Prior Order**

7         As an initial matter, the Court must determine whether the Forest Service's actions

8    "violate" Judge Rothstein's 1999 Order.  That Order granted a preliminary injunction, pending a

9    decisions on the merits, that barred the Forest Service from proceeding with the previous

10   incarnation of the Goose-Maverick ORV Tie Trail project without studying the cumulative

11   impacts of that project on the environment.  Because a key component of that project, the

12   proposed Maverick Saddle Bridge, has been incorporated into the current Mad River Trail

13   Project, a decision to forge ahead could have been contrary to law were Judge Rothstein's

14   Order still binding.

15        Unfortunately for plaintiffs, the 1999 Order no longer carries any force of law.  Following

16   the entry of the Order, the parties in that case stipulated that there was "no longer an active

17   dispute between the parties concerning the subject matter of the lawsuit"; as a result, the case

18   was dismissed and no ruling was made on the merits of the plaintiffs' claims.  (*See* Dkt. # 18-2)

19   (Government's Exhibit A).  Defendants correctly note that upon dismissal of *North Cascades*

20   *Conservation Council*, the preliminary injunction ceased to have legal effect.  Thus, the Court

21   rejects plaintiffs' argument that the Forest Service has presently "violated" the 1999 order.

22        However, Judge Rothstein's order is not without persuasive value in this particular case.

23   Defendants conceded as much during oral argument.  Her examination of the earlier Goose-

24   Maverick ORV Tie Trail project EA dealt with essentially the same parties as the present action,

25   before the same Court, litigating the same legal question with respect to the same critical

26   component of a Forest Service project.  To that extent, this Court finds much of the reasoning

1    persuasive to the instant case.

2            Now, as when Judge Rothstein examined the matter, "[n]othing in the administrative

3    record suggests that any environmental impact statement has ever been filed with respect to the

4    ORV system as a whole, or with respect to significant aspects of it." *North Cascades*

5    *Conservation Council*, 98 F. Supp. 2d at 1198.  But certain key components of the

6    administrative record have changed since she examined the matter.  In particular, the

7    government now offers a Biological Assessment on the impacts of the proposed project on

8    sensitive wildlife species (AR at 2619-37), a Biological Assessment on the impacts of the

9    project on sensitive fish species (AR at 2638-2715), and the Gaines Report, a literature review

10   and proposed study methodology on the impacts of motorized trail systems on wildlife (AR at

11   2831-2917), as evidence that it has complied with the procedural requirements of NEPA that

12   Judge Rothstein found lacking.

13           Accordingly, this Court's task is to determine whether or not this new information, upon

14   which the Forest Service has based its current Mad River EA, constitutes the necessary "hard

15   look" by the agency at the "cumulative environmental impacts" of the project that Judge

16   Rothstein found to be missing from the 1997 Goose-Maverick EA.  *See North Cascades*

17   *Conservation Council*, 98 F. Supp. 2d at 1199.

18           **D.  Judicial Review of NEPA Claims Under the APA**

19           NEPA does not provide a private cause of action to enforce its provisions.  Agency

20   decisions allegedly violating NEPA are reviewed under the APA.  *Native Ecosystems Council v.*

21   *U.S. Forest Service*, 428 F.3d 1233, 1238 (9th Cir. 2005) (citing *Neighbors of Cuddy Mountain*

22   *v. Alexander* (*Neighbors II*), 303 F.3d 1059, 1065 (9th Cir. 2002)).  Under the APA, the Court

23   reviews the agency's decision to only determine whether it was "arbitrary, capricious, an abuse

24   of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A); *Native*

25   *Ecosystems*, 428 F.3d at 1238.

26           It is well established in this Circuit that an agency "is required to prepare an EIS where

ORDER
PAGE – 9

1   there are substantial questions about whether a project *may* cause significant degradation of the

2   human environment." *Native Ecosystems*, 428 F.3d at 1239 (emphasis in original). In

3   particular, with respect to the examination of the Forest Service's decision to forgo the

4   preparation of an EIS, the agency must have considered such necessary information prior to the

5   entry of a FONSI that it can be said to have taken a "hard look" at the environmental

6   consequences of its actions. As the Court of Appeals has explained:

7           In reviewing an agency's decision not to prepare an EIS under NEPA, we
            employ an arbitrary and capricious standard that requires us to determine
8           whether the agency has taken a "hard look" at the consequences of its
            actions, "based [its decision] on a consideration of the relevant factors," and
9           provided a "convincing statement of reasons to explain why a project's
            impacts are insignificant."

10  *Nat'l Parks & Conservation Ass'n v. Babbit*, 241 F.3d 722, 730 (9th Cir. 2001) (citations

11  omitted). *See also Native Ecosystems*, 428 F.3d at 1239.

12      **E. Application to Plaintiffs' NEPA Claims**

13      Plaintiffs claim that the Mad River FONSI and the accompanying decision by the Forest

14  Service to proceed with the Mad River Trail Project without preparing an EIS were arbitrary

15  and capricious, and therefore unlawful. (Dkt. #1 at 13). Specifically, plaintiffs contend that the

16  decision violates NEPA in three ways. First, the Mad River EA fails to consider a reasonable

17  range of alternatives, as NEPA requires. (Dkt. #14 at 17). Second, the 2004 EAs for the Mad

18  River Trail Project and Goose-Maverick ORV Tie-Trail project are impermissibly segmented

19  and fail to examine the cumulative environmental impacts that the projects would have on the

20  whole Chiwawa-Entiat-Mad River ORV trail system. (Dkt. # 14 at 15). Finally, the decision

21  did not properly consider the effects that ORVs have on wildlife across the greater trail system.

22  (Dkt. #14 at 19). The Court examines these arguments in turn.

23          *1. The EA's Range of Alternatives*

24      Plaintiffs contend that the Mad River EA failed to consider an adequate range of

25  alternatives to satisfy NEPA. According to plaintiffs, the Forest Service was required to

26

1    consider in detail alternatives that provided for seasonal closures of the Lower Mad River Trail

2    to achieve the stated purpose and need for the project.  (Dkt. #14 at 18).  Plaintiffs also claim

3    that the Forest Service, based upon the volume of negative comments that it received on the

4    issue during the scoping process, should have considered alternatives that do not utilize

5    concrete grid blocks for trail hardening.  (Dkt. #14 at 18-19).  Underlying plaintiffs' rationale is

6    the basic argument that the Forest Service should have considered alternatives that would

7    reduce conflict and confrontations between hikers and motorized users.  (Dkt. #14 at 18).

8         Defendants respond that NEPA does not require an agency to examine every possible

9    alternative to a proposed action.  Moreover, defendants argue, NEPA does not require a

10   separate analysis of alternatives which are not significantly different from those actually

11   considered.  (Dkt. #18-1 at 18).  Thus, the Forest Service was under no compulsion to study the

12   alternatives that the plaintiffs suggest because, among other reasons, they were inconsistent with

13   the area's management prescriptions, compliance with which was incorporated into the EA's

14   statement of purpose and need.  (Dkt. #18-1 at 19).

15        The EA examined four alternatives.  The first was the so-called "no action" alternative, or

16   the status quo.  The second included relocation of certain trail segments on the Lower Mad

17   River Trail out of the flood plain, construction of the Maverick Saddle Bridge, and one phase of

18   improvements at Pine Flats campground.  The third was substantially the same as the second,

19   but proposed a hardening of the ford at Maverick Saddle rather than the construction of a

20   bridge.  The final, "preferred," alternative included all the components of alternative two, with

21   an additional phase of campground improvements at Pine Flats.  All of the alternatives included

22   construction of a helispot, use of concrete grid blocks for trail hardening, and removal of fire-

23   damaged dead trees, or "snags," that threaten to fall across the trail.  (AR at 2955-65).  The

24   Forest Service considered – but eliminated from detailed study – alternatives encompassing

25   plaintiffs' suggestions, as well as various others.  (AR 2952-54).

26        NEPA and its implementing regulations require that an EA "rigorously explore and

ORDER
PAGE – 11

1   objectively evaluate all reasonable alternatives, and, for alternatives which were eliminated from

2   detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. §

3   1502.14(a); *North Cascades Conservation Council*, 98 F. Supp. 2d at 1201.  However, NEPA

4   does not require that the EA consider alternatives other than those which address the purpose

5   and need of the project, or those which amount to nothing more than a challenge to the

6   announced management policy of the agency.  *See Northwest Coal. for Alternatives to*

7   *Pesticides v. Lyng*, 844 F.2d 588, 591 (9th Cir. 1988).

8         In the instant case, the Mad River EA considered an adequate range of alternatives in

9   relation to the stated purpose and need for the project.  While plaintiffs correctly point out that

10  an "EA . . . must select and discuss alternatives that foster informed decision making," their

11  challenge to the project on the basis that the alternatives examined will not reduce user conflict

12  is beside the point.  (Dkt. # 14 at 17-18).  According to the Forest Service, the need for the

13  project is not to facilitate increased harmony between user groups (supposing for the sake of

14  argument that trail closures would do this), but rather to reduce the impact of current uses on

15  fish, to decrease the spread of noxious weeds, to ensure that existing trails meet Wenatchee

16  Forest Plan management objectives, to reduce visitor hazards, and to accommodate increased

17  use of Pine Flats.  (AR at 2936).

18        Seasonal motorcycle closures of the Lower Mad River Trail from Maverick Saddle might

19  indeed reduce trail impacts on sensitive fish and riparian resources, as well as reduce the spread

20  of noxious weeds.  Defendants correctly point out that such closures would not, however, meet

21  the management objectives of the Wenatchee Forest Plan as it currently exists. (Dkt. #18-1 at

22  19).  The Forest Plan contemplates that those trails currently open to motorized use will remain

23  so.  (*See* AR at 2953).  Plaintiffs' comparison to the seasonal closure of the Upper Mad is

24  inapposite; reduction of user conflict is not the guiding principle behind the Forest Service's

25  spring closure of that area.  Rather, the area is closed in the spring and early summer to preserve

26  soft soils and meadows not present in the Lower Mad.  (*See* AR at 2954-55).

1    The appropriate place to raise objections to the multiple use management prescription of

2    the Forest Plan applied in the Mad River EA alternatives was at the Forest Plan level rather than

3    in a tiered EA.  While it may be true that the root cause of the natural resource damage in the

4    Mad River Basin is the fact that the Forest Service allows ORVs to be ridden there at all, a

5    challenge to an EA that is an attempt to debate overarching agency policy "is not the proper

6    subject of a NEPA action." *Lyng*, 844 F.2d at 591.

7                        *2. The Forest Service's Finding of No Significant Impact*

8    Plaintiffs next assert that the Forest Service did not sufficiently consider the cumulative

9    impacts of the Mad River Trail project, and did not properly study the impacts of the project on

10   wildlife.  Plaintiffs challenge the Forest Service's finding that the impact of the combined

11   proposed ORV trail system projects is insignificant.  In order to enter a Decision Notice and

12   FONSI, the agency must have reasonably concluded that the combined impact of the projects

13   will not, in fact, significantly affect the human environment within the meaning of 42 U.S.C. §

14   4332(C).   If, on the facts contained in the record, it is clear that the agency's determination of

15   significance was arbitrary and that its statement of reasons why no significant impact will result

16   unconvincing, then the Court must conclude that NEPA has been violated.  *See Nat'l Parks &*

17   *Conservation Ass'n*, 241 F.3d at 730.  That conclusion is compelled in this case.

18   In examining the persuasiveness of the Forest Service's finding that the Mad River Project

19   will not significantly affect the environment, the Court must look to the NEPA regulations that

20   define "significantly."  40 C.F.R. § 1508.27.  Whether a project is significant depends on "both

21   the project's context and its intensity."  *Id.*; *Native Ecosystems*, 428 F.3d at 1239.  According

22   to the governing regulations, the examination of a project's context "means that the significance

23   of an action must be analyzed in several contexts such as society as whole (human, national), the

24   affected region, the affected interests, and the locality."  40 C.F.R. § 1508.27(a).  Intensity, on

25   the other hand, "refers to the severity of the impact," and requires consideration of a number of

26   factors.  40 C.F.R. § 1508.27(b).  The parties raise issues with two of these considerations, in

1  particular: (1) "[w]hether the action is related to other actions with individually insignificant but

2  cumulatively significant impacts," 40 C.F.R. § 1508.27(b)(7); and (2) "[t]he degree to which the

3  action may adversely affect an endangered or threatened species or its habitat that has been

4  determined to be critical under the Endangered Species Act of 1973."  40 C.F.R. §

5  1508.27(b)(9).

6       The Court acknowledges that the agency's determination of significance "requires a high

7  level of technical expertise," and that "the informed discretion of the responsible federal

8  agencies" are entitled to substantial deference.  *Marsh v. Oregon Natural Resources Council*,

9  490 U.S. 360 (1989) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390 (1976)).  However, even

10  giving such deference to the Forest Services's scientific expertise, the Court concludes that the

11  agency's finding that the Mad River Trail Project would have no significant environmental

12  impact was arbitrary, capricious, and a violation of NEPA.

13       While it appears that defendants have made a significant effort to remedy the failures set

14  forth in Judge Rothstein's previous Order, they have failed to heed the warning that the "proper

15  reference point for a cumulative impacts inquiry is the entire ORV trail system."  *North*

16  *Cascades Conservation Council*, 98 F. Supp. 2d at 1198.  Instead, the agency has examined the

17  environmental effect of numerous system-impacting projects in a series of disconnected EAs

18  that make only passing reference to one another.  At the same time, the Mad River EA itself

19  states that such wildlife studies as have been done "do not reflect changes in use levels," but

20  rather merely propose models with which increased use could theoretically be studied in the

21  future.  (*See* AR at 3103).

22       Thus, as in *North Cascades Conservation Council*, the Court concludes in this case that

23  "the EA engaged in improper speculation as to the indirect and cumulative effects that the

24  Project might have on wildlife in the area of the ORV trail system."  98 F. Supp. 2d at 1200.

25  For these reasons, as discussed in more detail below, the Court finds that the Forest Service has

26  failed to provide a "convincing statement of reasons to explain why [the] project's impacts are

1    insignificant," and that its Mad River decision was a violation of the law.

2                                    a. Cumulative Impacts

3           Plaintiffs argue that the Mad River and Goose-Maverick projects should have been

4    analyzed by the Forest Service together in a single EIS.  According to plaintiffs, the Forest

5    Service has "persisted in treating the Mad River and Goose-Maverick components as if they

6    were totally separate and unrelated," and that even the United States Fish and Wildlife Service,

7    considers them to be simply two parts of a single proposed project.  (Dkt. #14 at 15).

8           Plaintiffs point to *Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2005), for the

9    proposition that the general rule of cumulative impacts analysis under NEPA requires a

10   sufficiently detailed catalogue of past, present, and future projects, and must provide adequate

11   discussion about how those projects, and differences between those projects, are thought to

12   have impacted the environment.  (Dkt. #14 at 17).  That requirement mirrors the definition of

13   cumulative impacts under NEPA:

14           *Cumulative impact* is the impact on the environment which results from the
             incremental impact of the action when added to other past, present, and
15           reasonably foreseeable actions regardless of what agency (Federal or non-
             Federal) or person undertakes such other actions.  Cumulative impacts can
16           result from individually minor but collectively significant actions taking place
             over a period of time.

17
18   40 C.F.R. § 1508.7 (emphasis in original).  Plaintiffs contend that the Mad River and Goose-

19   Maverick EAs, and the Mad River FONSI, fail to "catalogue, analyze or even mention

20   numerous past ORV construction components in the 200-mile Entiat Mad-River trail system,"

21   and, more significantly, the cumulative impacts of these actions have *never* been studied by the

22   Forest Service.  (Dkt. # 14 at 17).

23          Defendants argue that plaintiffs misunderstand the requirements of NEPA, and that the

24   Mad River EA, standing alone, sufficiently analyzes the cumulative environmental impacts of

25   the trail project.  In support of this argument, they cite to *Kleppe v. Sierra Club* for the

26   proposition that the "Supreme Court long ago rejected the notion the NEPA requires an agency

ORDER
PAGE – 15

1   to prepare a 'regionwide' EIS absent a proposal for regionwide action."  (Dkt. #18-1 at 14).

2   Defendants assert there is no evidence that the Mad River Trail Project is of regional scope, or

3   that there is any federal action that encompasses the entire 200-mile Entiat-Mad River trail

4   system.

5        Finally, defendants rely on 40 C.F.R. § 1508.25(a)(2), which provides that, in determining

6   the scope of an EIS, agencies must consider, "[c]umulative actions, which when viewed with

7   other proposed actions have cumulatively *significant* impacts and should therefore be discussed

8   in the same impact statement."  (Emphasis added).  Defendants argue that this language

9   indicates that full cumulative impacts analysis is only required when the agency itself determines

10  that environmental impacts may be significant.  (*See* Dkt. # 18-1 at 15).  Here, because the

11  agency has decided that no significant impacts will result from its actions, there is no

12  requirement that the multiple Forest Service projects be examined together in an EIS.  Because

13  an EA is merely a "brief" public document under 40 C.F.R. § 1508.9, NEPA does not require

14  that it catalogue the impacts of past, present, and future construction on the ORV trail system.

15       Defendants correctly assert that an EA should merely be a "concise public document."  40

16  C.F.R. § 1508.9(a).  However, they appear to ignore the remainder of the pertinent definition

17  which states that the document must "provide *sufficient evidence and analysis* for determining

18  whether to prepare an environmental impact statement or a finding of no significant impact."  40

19  C.F.R. § 1508.9(a)(1) (emphasis added).  When such sufficiency begins to push the EA toward

20  the same requirements as an EIS, it should put the agency on notice that an EA is not the right

21  tool for the task.

22       Defendants are also correct that "an EA is not intended to be an EIS."  (Dkt. #18-1 at

23  17).  They lose sight of the fact, however, that when relying on an EA in a FONSI, the agency

24  must have "based its decision on a consideration of the relevant factors and provided a

25  *convincing* statement of reasons to explain why a project's impacts are insignificant."  *Nat'l*

26  *Parks & Conservation Ass'n*, 241 F.3d at 730 (internal quotation marks and brackets omitted)

ORDER
PAGE – 16

1    (emphasis added).  The EA is not meant to be, and may not serve as, a substitute for an EIS

2    when federal actions may in fact have a cumulatively significant effect on the environment.

3         The Court is not persuaded by defendants' argument that, because the Forest Service has

4    declared its actions to be environmentally insignificant, the agency is then spared the task of

5    fully examining their cumulative impacts.  Contrary to defendants' assertions, 40 C.F.R.

6    § 1508.27(b)(7) explicitly marks cumulative impacts as a factor to be considered with respect to

7    significance in an EA.  Accordingly, defendants' claim that, "[b]ecause the Forest Service did

8    not identify any 'cumulatively significant impacts,' it was not required to prepare an EIS," is

9    incorrect.  (*See* Dkt. #18-1 at 16).  The very essence of NEPA is that the agency take a "hard

10   look" at the potential consequences of its decisions.  A simple declaration that a project's

11   cumulative impacts are insignificant, without a convincing explanation of why this is so, fails

12   this test.

13        Although the Mad River EA has numerous sections nominally referring to cumulative

14   impacts, it has one particular failing which renders the Forest Service's decision arbitrary: the

15   cumulative impacts analysis only fully accounts for the incremental environmental effect that the

16   Mad River Trail Project will have to the area above its *current* use levels, and then only with

17   cursory reference to the narrowly defined project area.  (*See, e.g.*, AR at 3036) ("There will be

18   no cumulative effect on Natural Integrity, Appearance, and Surroundings").  Aside from its

19   approach to wildlife issues (discussed in detail below), the EA makes no substantial accounting

20   of those use levels (particularly ORV use levels) against the background of what the Chiwawa-

21   Entiat-Mad River trail system might be like *without* motorized use.  Simply stated, the EA only

22   fully discloses incremental impacts above current levels, rather than addressing the overall level

23   of environmental impact caused by the trail system.

24        It is the *additive* effect of both agency and other actions taken together that constitutes

25   the gravamen of appropriate cumulative impacts analysis under NEPA.  As the Ninth Circuit has

26   instructed:

ORDER
PAGE – 17

> In accord with NEPA, the Forest Service must "consider" cumulative impacts. 40 C.F.R. § 1508.25(c). To "consider" cumulative effects, some quantified or detailed information is required. Without such information, neither the courts nor the public, in reviewing the Forest Service's decisions, can be assured that the Forest Service provided the hard look that it is required to provide.

*Neighbors of Cuddy Mountain v. U.S. Forest Service* (*Neighbors I*), 137 F.3d 1372, 1379-80 (9th Cir. 1998).

There are both temporal and geographic aspects to this requirement. For this reason, defendants' assertion that NEPA does not require "region-wide" analysis is misplaced in this case. Likewise, plaintiffs are correct when they point out that defendants' reliance on *Kleppe v. Sierra Club*, 427 U.S. 390, is similarly misplaced. As plaintiffs indicate, the "region" at issue in *Kleppe* was not the functional equivalent of a single ORV track system; rather, it was a multi-state, 90,000 square mile area. (Dkt. # 21 at 17); *Kleppe*, 427 U.S. at 414, n. 25. Even under *Kleppe*, NEPA contemplates that cumulative impacts analysis encompasses a single trail network in a single National Forest.

Essentially, plaintiffs' raise the question of whether, through incremental agency actions and private trail construction, the Forest Service can build an ORV trail system spanning several Forest Districts and approximately 600 square miles of terrain and still convincingly claim that its actions have no significant environmental impact. As plaintiffs pose the question: does NEPA allow the Forest Service to construct a "World Class single track motorcycle trail system"[1] within a proposed Wilderness, *without* preparing an EIS? (Dkt. #14 at 12).

The law requires that this question be answered in the negative. The Forest Service failed to heed the warning of *North Cascades Conservation Council* before pressing ahead with the separate Mad River and Goose-Maverick trail projects. Now, as then, "[w]ithin the NEPA scheme, any proposal adding to this ORV system . . . must be examined in light of the entire

---

[1] This is how the Forest Service *itself* describes the trail system in its public presentations. (*See* AR at 3627) (presentation at National OHV Collaboration Summit).

1    existing system." *North Cascades Conservation Council*, 98 F. Supp. 2d at 1198.  It also still

2    holds true that "the impact of the existing system, and whether it can bear an increase in use, has

3    never been carefully considered," and that "[w]ithout examining the ORV trail system, the

4    Forest Service cannot meaningfully measure cumulative environmental impacts in the fashion

5    that NEPA requires." *Id.* at 1199.

6         Because the Forest Service has again failed to thoroughly analyze the cumulative

7    environmental impacts of the Chiwawa-Entiat-Mad River trail system, its decision to proceed

8    with the Mad River Trail Project was arbitrary, capricious, and not in compliance with NEPA.

9                        b. Analysis of ORV Impact on Wildlife

10        In addition to their claim that the Mad River EA failed to properly consider the cumulative

11   environmental impacts of the ORV trail system, plaintiffs also argue that the Forest Service's

12   attempt to study the cumulative effects of trail system on wildlife was inadequate to meet the

13   requirements of NEPA.  Specifically, plaintiffs contend that the Court in *North Cascades*

14   *Conservation Council* ordered the Forest Service to do a "study" of the cumulative effects of

15   the ORV trail system on wildlife, and that the Gaines Report is not a study within the meaning

16   of Judge Rothstein's opinion.  (Dkt. # 14 at 19).

17        Plaintiffs believe that, instead, the Gaines Report fails to adequately assess the effects of

18   existing motorized trails on wildlife.  (Dkt. #14 at 20).  What the report does do, in plaintiffs'

19   view, is merely propose "post construction monitoring of impacts and potential responsive

20   modifications in management of use."  (Dkt. #14 at 20) (citing AR at 2835).  In other words,

21   plaintiffs believe that all the Gaines Report does is say that "the Forest Service '*could*' do a

22   study – *in the future* – if it undertakes to do so," but that it "has not yet done so in the

23   Chiwawa-Entiat-Mad River trail system."  (Dkt. #14 at 20, n.17).

24        Defendants respond that the BAs are sufficient to satisfy Judge Rothstein's requirement

25   that a site-specific wildlife study be performed.  (Dkt. # 18-1 at 20-21).  To the extent that

26   defendants respond to plaintiffs' characterization of the Gaines Report, they concede that it is

1  not a site-specific wildlife study, but argue that it "provides a consistent scientific methodology

2  for the Forest Service to employ in designing site specific studies for the purpose of assessing

3  impacts on wildlife from trail use in a given area under particular proposed project alternatives."

4  (Dkt. #18-1 at 21).  According to the defendants, "[t]he Gaines report was used by the Forest

5  Service as a basis for developing a study methodology, or 'module,' in order to conduct a site

6  specific wildlife analysis of the proposed alternatives for the areas affected by the Mad River

7  Trail project."  (Dkt. #18-1).

8        Defendants then appear to implicitly argue that, while the Gaines Report does nothing

9  more than provide a methodology to study the cumulative impacts of the trail system on

10  wildlife, this method was fully applied in the small Mad River Trail Project analysis area.  Given

11  the detailed explanation here and in *North Cascades Conservation Council* about how

12  appropriate cumulative impacts analysis must measure the impacts across the *entire* ORV trail

13  system in order to satisfy NEPA, this argument is not entirely persuasive.  However, the Court

14  recognizes that the Gaines Report, as applied in the EA, does more than just provide a

15  methodology and a Lower Mad River Trail-specific wildlife analysis, albeit not enough to allow

16  the finding that NEPA has been satisfied.

17        The report, first and foremost, develops a statistical model to qualitatively (as opposed to

18  quantitatively) assess the impacts of the "linear recreation routes" – roads and trails – on

19  wildlife.  (*See* AR at 2839-46).  It divides species on the basis of their behavioral and habitat

20  characteristics (for example, "wide-ranging carnivores"), and then allows further monitoring of

21  these groups on the basis of "focal species" within them (e.g., gray wolves).  (*See* AR at 2840).

22  Then, based on a review of scientific studies, the report hypothesizes likely "buffer zones"

23  alongside trails that subject the various focal species to different levels of environmental stress.

24  (AR at 2841-42).  Finally, the report summarizes the results (the actual calculations are absent

25  from the record) of the application of these buffer zones to the trail systems in the Wenatchee

26  National Forest.  On the basis of these results, the report estimates, by trail, the level of impact

1    caused by the trail on species groups as low, moderate, or high.  (*See, e.g.*, AR at 2880-85).

2        Although the agency's use of the Gaines Report amounts to a tentative step in the

3    direction of cumulative impacts analysis with respect to *wildlife* – for example, enabling the

4    Mad River EA to note that various species in the limited Mad River project area are subject to

5    high, moderate, or low degrees of human influence (*see* AR at 3096-3111) – it does not amount

6    to the sufficient evidence and analysis necessary to conclude that the cumulative effects of the

7    projects are insignificant.  If anything, a fair reading appears to compel the opposite conclusion.

8    (*See, e.g.*, AR at 2884) (Table 26, rating the environmental impact of trails on various

9    watersheds as "high").

10       Moreover, the report's general reference only to the low, moderate, and high impacts of

11   the trail system on certain focal species fails to amount to the actual detailed analysis that is

12   required by NEPA.  Indeed, the Gaines Report is frank about its methodology, stating that,

13   "[b]ecause quantitative evaluation of cumulative recreation effects was not possible owing to

14   *data limitations for many species*, we developed a qualitative ranking scheme."  (AR at 2842)

15   (emphasis added).  This amounts, in essence, to an admission that no actual, in-the-field study

16   resulting in quantitative analysis (for example, of the type conducted in the BAs) has yet been

17   done for the entire ORV trail system.  While those BAs prepared and incorporated by reference

18   in the Mad River EA are certainly sufficient under this standard, they look only at the

19   incremental impacts of the Mad River Trail Project on key sensitive species, and then only in the

20   narrowly defined project area.

21       The report takes the Court – and the public – to a general level of analysis, and then stops,

22   proposing further study.  As plaintiffs point out, however, the Forest Service does not

23   incorporate any mandates for actual, system-wide wildlife studies into the Mad River decision.

24   Rather, the agency proposes to construct the Mad River Trail Project, as well as the Goose-

25   Maverick ORV Tie-Trail project and then, at most, apply the "adaptive management strategies,"

26   put forward by the Gaines Report.  (*See* AR at 2889-91) (positing a "hypothetical" adaptive

1   management plan, which is – perhaps not coincidentally – surprisingly similar to the project at

2   issue in this case).  These strategies amount, when applied to the Mad River Trail Project, to a

3   "build-first, study later" approach to resource management.  This backward-looking decision

4   making is not what NEPA contemplates.  As the Ninth Circuit instructs, it is not "appropriate to

5   defer consideration of cumulative impacts to a future date.  'NEPA requires consideration of the

6   potential impact of an action *before* the action takes place.'" *Neighbors I*, 137 F.3d at 1380

7   (citing *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1313 (9th Cir. 1990) (emphasis in

8   original)).

9       For these reasons, the Court finds that the Forest Service's consideration of the

10  cumulative impacts of the Mad River Trail Project on wildlife is inadequate, and therefore, the

11  Forest Service's decision to proceed with the project on the basis that it will cause no significant

12  environmental impact was arbitrary, capricious, and a violation of NEPA.

13      **F. Injunctive Relief**

14      In order to determine whether injunctive relief is appropriate, a federal court confronted

15  with a violation of NEPA applies the "traditional balance of harms analysis."  *Nat'l Parks &*

16  *Conservation Ass'n*, 241 F.3d at 737.  As the Supreme Court has instructed, "the bases for

17  injunctive relief are irreparable injury and inadequacy of legal remedies.  In each case, a court

18  must balance the competing claims of injury and must consider the effect on each party of the

19  granting or withholding of the requested relief."  *Amoco Production Co. v. Village of Gambell*,

20  480 U.S. 531, 542 (1987).

21      While particular attention should be "given to the public interest, '[t]he grant of

22  jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under

23  any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated

24  to grant an injunction for every violation of law.'"  *Id.*  (quoting *Weinberger v.*

25  *Romero-Barcelo*, 456 U.S. 305, 313 (1982)).

26      Plaintiffs argue that they will suffer irreparable injury if the Forest Service is allowed to

ORDER
PAGE – 22

1   proceed with the project without preparing an EIS.  They base this claim on the assertion that

2   the project "will damage the environment by blasting, clearing brush, and constructing a bridge

3   and related ground disturbance." (Dkt. #14 at 12).  With respect to whether the injury plaintiffs

4   claim is irreparable, the Supreme Court instructs, "[e]nvironmental injury, by its nature, can

5   seldom be adequately remedied by money damages and is often permanent or at least of long

6   duration, i.e., irreparable." *Village of Gambell*, 480 U.S. at 545.  At the same time, the burden

7   on the Forest Service of preparing an EIS, while significant, is of limited duration.  Defendants

8   have failed to address the scope or propriety of injunctive relief in this case.  Instead, defendants

9   assert that the ordinary remand rule applies.

10      The Court finds that the ordinary remand rule does not apply to this case.  The very fact

11  that this Court has found that an EIS must be completed before the Mad River Trail Project can

12  move forward mandates an injunction.  Furthermore, plaintiffs have demonstrated that

13  irreparable injury will occur if an injunction is not issued, and the balance of harms tips in their

14  favor.  Accordingly, the Court will enjoin the Forest Service from attempting or completing any

15  work on the Mad River Trail Project, or taking any other action to implement the project, until

16  the agency has complied with NEPA by analyzing the project in an EIS.

17                              **III.  CONCLUSION**

18      Having considered plaintiffs' motion for summary judgment and preliminary injunction,

19  defendants' cross-motion for summary judgment, the briefs, declarations and exhibits in

20  opposition and support of those motions, the oral arguments that took place on June 13, 2006,

21  and the remainder of the record, the Court hereby ORDERS:

22      (1)  Plaintiffs' Motion for Summary Judgment (Dkt. #13) is GRANTED.

23      (2)  Defendants' Cross-Motion for Summary Judgment (Dkt. #17) is DENIED.

24      (3)  Plaintiffs' Motion for Permanent Injunction (Dkt. #13) is GRANTED, and defendants

25  are hereby enjoined from the construction of the Mad River Trail Project until such time as the

26  Forest Service has completed an EIS.

1   (4)  The Clerk shall direct a copy of this Order to all counsel of record.

2   DATED this  19  day of June 2006.

3

4                                                    RICARDO S. MARTINEZ
                                                     UNITED STATES DISTRICT JUDGE
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER
PAGE – 24